## John Hall and Donna Hall v. Clarence C. Miller and Clarence C. Miller, Jr.

[465 A.2d 222]

No. 316-81

Present: Billings, C.J., Underwood, Peck and Gibson, JJ.

Opinion Filed June 7, 1983

138

*Paterson, Walke & Pratt, P.C.*, Montpelier, for Plaintiffs-Appellees.

*Richard E. Davis Associates, Inc.*, Barre, for Defendants-Appellants.

Gibson, J. Plaintiffs, John and Donna Hall, began operating a dairy farm in East Montpelier in 1965. In December, 1971, plaintiffs purchased three bred heifers, cattle expected shortly to calve, from defendants, who operated the largest cattle dealership in Vermont. Within the next few months defendants sold two other registered Holsteins to plaintiffs, as well as numerous other cattle to Vermont dairy farmers.

Despite the requirements of Department of Agriculture regulations, defendants did not keep complete and accurate records regarding the movement of their herd. In part because of this lack of tag number recording, it became impossible to follow with precision the sale and resale of every cow. However, for the purposes of this appeal, it is enough to note that, by April of 1972, certain cattle purchased by defendants from a Delaware-based cattle dealership and then resold in Vermont carried brucellosis. Brucellosis is a highly contagious venereal disease which causes cows to abort and to become unsuitable for milk production. As a result of this contamination, all of plaintiffs' 107 cows were quarantined by the Department of Agriculture and eventually 40 were sold for slaughter. During the next year and a half, seven other Ver-

mont herds with cows from defendants' Delaware supplier tested positively to the disease. In the view of some experts, Vermont became host to its worst outbreak of brucellosis in a decade.

Plaintiffs brought suit to recover for their losses caused by selling dairy cattle for slaughter and for expenses associated with the quarantine of their herd. The liability issue was tried separately, and the action went to the jury on the theory of a breach of the implied warranty of merchantability under 9A V.S.A. § 2—314. After a jury verdict in plaintiffs' favor, the damage issue was tried by court, with the consent of the parties, and defendants were ultimately found liable for losses of $62,510.59 and interest of $42,285.27.

## I. Liability Issue

On appeal, defendants have preserved two claims related to the liability issue. Other theories advanced on appeal were not raised below and thus will not be considered. *Howard Bank* v. *Iron Kettle Restaurant of Bolton, Inc.*, 139 Vt. 374, 375–76, 428 A.2d 1138, 1139 (1981). Defendants argue (1) that expert testimony and other evidence of the transmission of brucellosis by their cows is too speculative to be legally competent; and (2) that defendants, father and son, are mere agents of the "Miller Corporation" and, as such, are improper parties to this suit and not personally liable.

The second issue is quickly disposed of. Defendants cite us to case law relevant to contracts signed by a known agent acting within the scope of his authority for a disclosed principal, which hold that under such circumstances the agent is not liable thereon. Cf. *Hall* v. *Huntoon*, 17 Vt. 244 (1845). Although a "Miller Corporation" was in existence until May, 1972, this fact was never made known to plaintiffs, and the record of the parties' transactions is devoid of evidence of a corporate entity. The plaintiffs' checks were payable to and endorsed by C. C. Miller personally; health and import documentation relating to the cattle uniformly listed Mr. Miller and did not suggest a corporate identity. Miller, Jr., also represented that he worked "for his father," and never revealed the existence of a corporation. We find no error

in the trial court's refusal to dismiss the action against defendants as individuals.

The gravamen of defendants' appeal is their allegation that plaintiffs base their case on speculation and compound inferences. They cite *Wellman* v. *Wales*, 97 Vt. 245, 122 A. 659 (1923), for the proposition that one inference may not be based on another in reaching a verdict. Such is not the case here. Plaintiffs relied on the testimony of two experts who, although unable to identify the precise method of transmittal, both agreed that defendants' Delaware imports were the source for the disease in plaintiffs' herd, basing their inference of causation on circumstantial evidence.

Brucellosis may be transmitted either directly between infected and uninfected cows, or indirectly through a carrier animal. Viewing the evidence, as we must, in the light most favorable to the plaintiffs, *Quechee Lakes Corp.* v. *Terrosi*, 141 Vt. 547, 552, 451 A.2d 1080, 1083 (1982), the evidence showed that the state had been virtually free of brucellosis for nearly seven years prior to the introduction of the Miller cattle from Delaware, that in April of 1972 two of the cows defendants had imported from Delaware showed positive reactions to the brucellosis blood test, that farmers who purchased Delaware imports from defendants developed brucellosis in their herds shortly thereafter, that plaintiffs purchased five cows from defendants which had come from Delaware, that plaintiffs discovered brucellosis in their herd in October of 1972, and that other possible sources of infection were either impossible or improbable.

Circumstantial evidence provides an appropriate basis from which to draw reasonable inferences. *Vermont Food Industries, Inc.* v. *Ralston Purina Co.*, 514 F.2d 456, 462–63 (2d Cir. 1975). As we have said, absolutely irrefutable inferences are not required by law.

> In the very nature of things no direct proof of the cause of the trouble can be given. Direct proof is not necessary. Circumstantial evidence may be resorted to, and such evidence will be sufficient to justify the verdict below, if there can be drawn therefrom a rational inference that the [defendants' product] was the source of the trouble.

*Patton* v. *Ballam & Knights,* 115 Vt. 308, 314, 58 A.2d 817, 821 (1948). See also *Boguski* v. *City of Winooski,* 108 Vt. 380, 386–87, 187 A. 808, 811 (1936). There was no error in plaintiffs' proof of causation of the brucellosis infection based in part on well-supported inferences, and the jury was justified in deciding for the plaintiffs on the evidence before it.

█ Defendants attack not only the propriety of inferential evidence, but also the ability of the plaintiffs' experts to give opinions, notwithstanding the provisions of 12 V.S.A. § 1643. However, defendants made no motion to strike the expert testimony, and it therefore was properly before the jury. See generally *Lambert* v. *Fuller,* 131 Vt. 181, 303 A.2d 471 (1973). Both experts were well qualified to give opinions based on their personal knowledge and skill, and on the facts already in evidence. Certainly defendants' cross-examinations of the witnesses were thorough, even though ultimately unsuccessful. "The question of competency of an expert witness is a preliminary one for the trial court to determine in its sound discretion, and the court's action is not revisable on appeal unless it appears from the evidence to be erroneous or founded upon an error of law." *Northern Terminals, Inc.* v. *Smith Grocery & Variety, Inc.,* 138 Vt. 389, 392, 418 A.2d 22, 24 (1980) ; see also *O'Bryan Construction Co.* v. *Boise Cascade Corp.,* 139 Vt. 81, 89–90, 424 A.2d 244, 248 (1980). Our review of the evidence indicates that there was no such error.

## II. Damage Issues

Defendants also advance three reasons why the damage award should not stand, which we address in turn.

### A. The Collateral Source Doctrine

█ For more than a century, Vermont courts have applied the collateral source doctrine to deny to a defendant a setoff for payment the plaintiff receives from a third, or collateral, source. See, e.g., *Harding* v. *Town of Townshend,* 43 Vt. 536 (1870). Most commonly applied in cases where an insurance company has made a payment to plaintiff to compensate for a loss, the collateral source rule prevents the defendant wrongdoer from benefiting from the plaintiff's foresight

in acquiring the insurance through any offsetting procedure. Opponents of this doctrine point out that the plaintiff unfairly receives a double recovery, once from the insurer and once from the defendant. Proponents counter that the defendant should not be relieved from all financial obligation because of the existence of a source completely remote from defendant's action. Moreover, to hold otherwise would inject into a liability trial litigation regarding the recovery prospects from this third source—raising issues clearly tangential to the original cause of action. As this Court said in the oft-quoted *Northeastern Nash Automobile Co.* v. *Bartlett,* 100 Vt. 246, 258, 136 A. 697, 701 (1927):

> It is not of the slightest consequence who reimbursed plaintiff, or under what circumstances, if defendant was not connected therewith, and there was no evidence to warrant an inference that he was. The thief who takes my property cannot escape liability to me simply because some insurance company, or my friends, or neighbors, have compensated me for my loss. . . . "A person committing a tort cannot set up in mitigation of damages that somebody else, with whom he has no connection, has either in whole or in part indemnified the injured party."

*Id.* (citations omitted) (quoting *Weber* v. *Morris & Essex R.R.,* 36 N.J.L. 213, 215 (1873)).

This Court has not, however, previously faced the issue of the applicability of the collateral source doctrine in breach of warranty actions. We do so now because of the particular circumstances of this case. Forty of plaintiffs' cows were "branded" by the state veterinarian to indicate a positive reaction to the brucellosis tests. The branded animals were required by law to be slaughtered and sold at the prevailing beef price. Under state and federal indemnification programs, designed to encourage prompt compliance with the disposal orders and prevent further spread of the disease, plaintiffs received a total payment of $9,275.50. The federal government, pursuant to 21 U.S.C. § 134a(d), paid plaintiffs $2,850.00. The State of Vermont, under authority of 6 V.S.A. § 1141, paid the remaining $6,425.50.

Defendants maintain that plaintiffs' recovery should be reduced by this amount, arguing that the collateral source rule

does not apply for two reasons. First, plaintiffs' recovery through the indemnification programs was completely fortuitous and in no way the result of plaintiffs' foresight or expense. Thus, plaintiffs should not be allowed a double recovery. Second, collateral source rules apply when one party is a wrongdoer, a factor they argue is not present here, as this is not a tort action but one based on contract, and as the breach of the implied warranty was neither alleged nor shown to be intentional or even manifest. Rather, the "defect" in the cattle was latent and not discoverable without testing and attendant expense, which should in any event have been the buyer's responsibility.

Although the view is not unanimously shared, we think the better rule is that the collateral source rule should apply to actions sounding in contract, as well as in tort. The breaching party in a contract action or, as here, a breach of warranty action, may not be a wrongdoer in the same sense as is a tortfeasor. Nonetheless, as between the two parties, it is better that the injured plaintiff recover twice than that the breaching defendant escape liability altogether.

In 1955, the Seventh Circuit Court of Appeals observed that it was unable to find "a single case in which [the collateral source rule] had been carried over to contract damages." *United Protective Workers* v. *Ford Motor Co.,* 223 F.2d 49, 54 (7th Cir. 1955). Since that time, however, a number of courts and legislatures have addressed this issue and found the rule applicable. See, e.g., *Klein* v. *United States,* 339 F.2d 512, 517–18 (2d Cir. 1964) (applying New York law) ; *Hartnett* v. *Riveron,* 361 So. 2d 749, 751 (Fla. App. 1978) ; *Rutzen* v. *Monroe County Long Term Care Program, Inc.,* 104 Misc. 2d 1000, 429 N.Y.S.2d 863, 864 (1980); D. Dobbs, Remedies § 3.6, at 185 (1973). See also *NLRB* v. *Gullett Gin Co.,* 340 U.S. 361, 364 (1951) (despite potential double recovery, collateral state unemployment compensation benefits need not be deducted from back pay award) ; *Marshall* v. *Goodyear Tire & Rubber Co.,* 554 F.2d 730, 736 (5th Cir. 1977). But see *Grover* v. *Ratliff,* 120 Ariz. 368, 586 P.2d 213, 215 (1978) ; Note, *Unreason in the Law of Damages: The Collateral Source Rule,* 77 Harv. L. Rev. 741 (1964).

144

■ Plaintiffs direct our attention to the factually similar case of *Roundhouse* v. *Owens-Illinois, Inc.*, 604 F.2d 990 (6th Cir. 1979). Defendants there sold plaintiffs trout for their fish ranch which were afflicted with "whirling disease." The State of Michigan ordered the trout destroyed to prevent the spread of the disease and subsequently provided partial compensation to plaintiffs of $51,000. In holding the collateral source rule applicable to the breach of warranty action, the Court of Appeals reasoned that the state payments were truly "independent of (collateral to) the wrongdoer." *Id.* at 994. Moreover, as in this case, the state was not a party to the action nor aligned with a party. We approve the result in this and the previously cited cases, and therefore hold that defendants here may not offset their adverse judgment by the amount plaintiffs recovered from sources wholly independent from the defendants.

■ We note finally that defendants misapprehend the reasoning in *My Sister's Place* v. *City of Burlington*, 139 Vt. 602, 433 A.2d 275 (1981), which they argue limits the collateral source rule to cases where the plaintiff has reaped the "double benefit" through plaintiff's forethought. Although this Court in *My Sister's Place* denied application of the rule, the factual context there was completely dissimilar. Plaintiffs received payment from their landlord for leasehold improvements. Later, they sought the protection of the rule to avoid having to deduct from a judgment they won against the city the amount the landlord had paid them. This Court held that, on those facts, a quid pro quo existed between the landlord and the plaintiffs which was irrelevant to the cause of action based on the tort of the city deputy fire warden. Thus, the damages caused could only be accurately measured by allowing the setoff. In Vermont, the rule has never been limited, expressly or impliedly, to situations where plaintiff has paid for the protection of insurance. See *Kerr* v. *Rollins*, 128 Vt. 507, 512, 266 A.2d 804, 808 (1970); *Northeastern Nash Automobile Co.* v. *Bartlett, supra,* 100 Vt. at 257–58, 136 A. at 701.

### B. Lost Profits

Defendants also argue on appeal that plaintiffs would receive a double recovery for another reason. Defendants were

ordered to pay plaintiffs $23,624.56 for the difference between the fair market value of dairy versus beef cattle for the 40 cows sent to slaughter. In addition, plaintiffs received from defendants some $36,000.00 for lost profits from those cows, $10,000.00 for the lower milk production of the replacements and $26,000.00 for lost profits due to the smaller herd size. Defendants assert that the fair market value of a dairy cow is determined by its ability to produce milk and therefore the award of damages includes a recovery for the value of that cow's potential milk production.

Defendants' position is buttressed by their experts' testimony, but contradicted by expert testimony from the plaintiffs. We need not chronicle the arguments for or against either side; suffice it to say that credibility of witnesses, even experts, is a matter for the finder of fact. The trial court hearing the issue of damages made lengthy and detailed findings, in which it adopted the plaintiffs' proof over that of defendants. Error does not appear from the failure to adopt one side's findings. The additional findings made by the trial court provide "a clear statement to the parties and to this Court . . . upon all material issues raised by the pleadings and evidence," *In re Estate of Young,* 135 Vt. 390, 391, 376 A.2d 339, 340 (1977) ; they are sufficient and are all that we require.

Moreover, by statute in Vermont, the measure of damages for a buyer when the seller breaches a warranty may include both the price difference between goods delivered and the goods expected, 9A V.S.A. § 2—714, and any incidental and consequential damages, including lost profits. 9A V.S.A. § 2—715. See, e.g., *M. K. Metals, Inc. v. Container Recovery Corp.,* 645 F.2d 583, 590 (8th Cir. 1981) (Missouri law) ; *International Petroleum Services, Inc. v. S & N Well Service, Inc.,* 230 Kan. 452, 463, 639 P.2d 29, 38 (1982) ; *Leininger v. Sola,* 314 N.W.2d 39, 45–47 (N.D. 1981) ; *General Supply & Equipment Co. v. Phillips,* 490 S.W.2d 913, 920 (Tex. Civ. App. 1972). Here, the economic losses suffered by plaintiffs could not reasonably be prevented by "cover" or otherwise, a requirement of § 2—715(2)(a), both because suitable brucellosis-vaccinated cattle were not immediately available, and

because plaintiffs were fully extended and thus financially unable to replace all their cattle as quickly as the State destroyed them.

No error appears in the award of lost profits or in the computation of that award based on fair market value as testified to by plaintiffs.

## C. Prejudgment Interest

As their last claim, defendants argue that prejudgment interest should not have been awarded on unliquidated damages. The unliquidated damages component included both the value of the cattle lost and the amount of profits lost due to plaintiffs' forced sale of their herd. Defendants base their claim on the contention that the damages were speculative and could not be "established with reasonable certainty."

To the extent that defendants challenge the size of plaintiffs' milking herd, we must discount their argument. There was ample testimony below to support the trial court's findings that plaintiffs needed to establish a milking herd of eighty cows. We will not supplement our judgment for a supportable determination by the fact finder on a purely factual issue. Further, the loss of profits from milkers with proven production records is not so contingent as to be unsupportable. Both the plaintiffs and plaintiffs' experts testified as to plaintiffs' losses and the dates thereof. The trial court's decision to award interest on those losses to attempt to make plaintiffs whole was well within its discretion. Cf. *Quinlan* v. *Hamel*, 143 Vt. 147, 465 A.2d 232 (1983); V.R.C.P. 54(a).

While the above discussion disposes of all the issues presented on appeal, in the course of our examination of the record, we notice two instances of possible mathematical errors: (1) Finding of Fact number 28 indicates a total cost of twenty-five replacement cows at $18,040.00. Defendants correctly point out that the addition of all twenty-five prices yields a total of $17,685.00. This figure should be recomputed either to correct the amount or explain the $355 discrepancy; (2) Conclusion of Law number 19 computes interest at 12% running from April 1, 1979. The effective date of the amendment to 9 V.S.A. § 41 which raised the interest to 12% was July 1,

1979. See 1979, Vt. Pub. Acts, No. 82, § 1. Interest should be recomputed to correct this calculation.

*Judgment affirmed as to liability. Judgment affirmed in all respects as to the components of the damage award, but reversed for recomputation of damages consistent with the views expressed herein.*