2008 VT 27

## Windsor School District v. State of Vermont and Department of Corrections

[956 A.2d 528]

No. 06-082

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 7, 2008

Motion for Reargument Denied April 15, 2008

*Robert E. Manchester* of *Manchester Law Offices, P.C.*, Burlington, for Plaintiff-Appellant/Cross-Appellee.

*Samuel Hoar, Jr., Shapleigh Smith, Jr.* and *Douglas D. Le Brun* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, and *William E. Griffin*, Chief Assistant Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Defendants-Appellees/Cross-Appellants.

¶ 1. **Dooley, J.** This case arises out of a suit by Windsor School District (Windsor) against the State of Vermont and the Vermont Department of Corrections (DOC) to recover expenses related to the environmental cleanup of district property formerly owned by the State. The trial court concluded that Windsor was entitled to be reimbursed for consultant's and attorney's fees incurred in connection with the investigation and remediation of the site. On appeal, Windsor contends that the court erred in rejecting its additional claims for legal expenses incurred in bringing this action, for attorney's fees sustained in a suit against its insurers for coverage and defense costs, and for prejudgment interest. Windsor also asserts that the court erred in rejecting its claims based on the Vermont Groundwater Protection Statute, 10 V.S.A. § 1410, and common-law implied indemnity. The State has also appealed, asserting that the award of consultant's and attorney's fees was improper and unsupported by the evidence and that the trial court erred in declining to offset insurance monies recovered by Windsor against the damage award. We affirm.

¶ 2. This is the second appeal to come before this Court relating to the Windsor hazardous waste site. The basic facts were set forth in *State v. CNA Insurance Cos.*, 172 Vt. 318, 779 A.2d 662

(2001),[1] and may be summarized as follows. The State of Vermont operated a state prison on a parcel of land that it owned in the Town of Windsor until the early 1970s. From about 1954 to 1958, DOC ran a wood treatment facility on the property, which entailed dipping wooden posts into tanks filled with a combination of kerosene and a wood preservative called pentachlorophenol. In 1976, DOC conveyed a portion of the property, including the area where the treatment facility had operated, to Windsor.

¶ 3. Although the wood-treatment facility operated for only a few years, and stopped functioning well before Windsor purchased the property, substantial spillage, combined with periodic floods, resulted in significant contamination of the site. No one associated with Windsor, however, was aware of any pollution at the site until July 1995, when DOC informed the district superintendent that a survey had detected the possibility of hazardous waste. Thereafter, Windsor engaged two environmental consulting firms to investigate and analyze the data collected, which confirmed the presence of pollution. These firms found that the spillage had not affected the Town's water supply or the nearby Mill Brook. In November 1995, Windsor's attorney wrote to DOC informing it that Windsor's investigation was complete and requesting that DOC assume full responsibility for the cleanup. Although unwilling to do so, DOC engaged its own consultant to carry forward the investigation and analysis, while Windsor's engineering experts and attorney continued to monitor the process. Ultimately, the Vermont Agency of Natural Resources (ANR) hired its own consultant and subcontractors to complete the cleanup.

¶ 4. In October 1996, Windsor filed a complaint in superior court against the State and DOC seeking, inter alia, reimbursement for the money spent investigating and remediating the site. Windsor asserted several theories of statutory recovery, including one under the Vermont Waste Management Act, 10 V.S.A. §§ 6601-6632, and the Vermont Groundwater Protection Statute, 10 V.S.A. § 1410, and one based on common-law implied indemnity.[2] The parties agreed to bifurcate trial on the issues of liability and damages. Following a lengthy bench trial, the court issued a

---

[1] *CNA Insurance Cos.* involved a declaratory relief action by DOC against its insurers for coverage of the costs relating to the contamination of the same site.

[2] Although implied indemnity was not included in the original complaint, the trial court granted Windsor's subsequent motion to amend the complaint to include the claim.

written decision on liability in February 2002. The court concluded that both Windsor and DOC were responsible parties under the relevant provision of the Waste Managment Act, 10 V.S.A. § 6615(a),[3] and that Windsor was entitled to indemnification of its reasonable expenses in investigation, removal and remediation of the site under § 6615(i).[4] The court dismissed the statutory-groundwater and common-law-implied-indemnity claims.

¶ 5. Thereafter, following additional briefing, the court issued a decision on the law relating to damages, ruling that it would allow Windsor to recover its "site engineering" and "site management expenses," along with its consultant's and attorney's fees, as well as interest on the bank loans that Windsor had taken out to finance these services. However, the court did not permit recovery of so-called liability apportionment expenses, including the legal expenses that Windsor incurred in bringing suit against DOC. After an additional two-day trial on damages, the court issued a third decision, awarding Windsor damages of $297,346.16 in consultant's expenses and $150,000 in attorney's fees. In so doing, the court rejected Windsor's request to be reimbursed for attorney's fees incurred in an earlier declaratory-relief action against its insurers CNA and Hartford for coverage of expenses and defense costs, and reaffirmed its ruling denying reimbursement of the legal expenses that Windsor incurred in bringing the action against DOC. The court subsequently issued a fourth and final order, rejecting Windsor's request for prejudgment interest. Reduced by an unconditional payment of $300,000 from the State, the final judgment awarded Windsor damages of $228,981.03.[5] Separate appeals by Windsor and DOC followed.

---

[3] This section provides that, when there is a release or threatened release of hazardous waste contaminants, "the owner or operator of a facility, or both," as well as "any person who at the time of release . . . owned or operated" the facility shall be liable for "abating such release" and paying "costs of investigation, removal and remedial actions incurred by the state which are necessary to protect the public health or the environment." 10 V.S.A. § 6615(a).

[4] This section provides that, "[i]n an action brought by the secretary under this section, a responsible person may implead, or in a separate action a responsible person may sue, another responsible person or persons and may obtain contribution or indemnification." 10 V.S.A. § 6615(i).

[5] The original consultant's and attorney's fees awards were reduced by an amount equal to the small payments received from the Vermont Department of Education. Thus, the final judgment of $228,981.03 reflects an award of $286,578.43 for consultant's expenses, $138,300.08 for attorney's fees, and $104,102.52 for bank

## I.

¶ 6. As noted, both Windsor and DOC challenge various aspects of the court's rulings on liability and damages. For organizational purposes, we shall address their claims jointly, according to the category of damages or liability to which they principally relate, beginning with consultant's and attorney's fees. DOC contends that the court erred in awarding damages to reimburse Windsor for expenses incurred after November 1995, when Windsor's attorney wrote a letter to the DOC stating that its investigation of the site was complete and assigning responsibility for all past and future investigation, risk assessment, and remediation solely to [DOC]. Although, as noted, DOC and ANR subsequently assumed primary responsibility for the investigation and remediation of the site, Windsor continued to retain the services of an attorney and environmental consultants to advise it and protect its interests during the remaining phases of the cleanup project.

¶ 7. At the outset, we note that the court's judgment involves three types of expenses: (1) attorney's fees, (2) consultant's expenses, and (3) interest on bank loans to fund the attorney's fees and consultant expenses. DOC has not independently challenged recovery of the third type of expenditure, the interest on the bank loans. Thus, we treat this interest expense as part of the cost of the attorney's fees and the consultant's expenses and do not consider it separately.

¶ 8. We also note that the superior court lumped the attorney's fees and consultant's expenses together, using the rationale for recovery of the attorney's fees to also cover the consultant's expenses. While we agree that some of the consultant's expenses can be justified by this rationale, we conclude that there is an independent rationale for the consultant's expenses and discuss that rationale later. We begin, however, with the issue of attorney's fees.

¶ 9. DOC maintains that the correct standard for determining the propriety of an award of attorney's fees in this context is that set forth in *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994). In *Key Tronic*, the United States Supreme Court held that, under the federal Comprehensive Environmental Response, Com-

---

interest on loans to finance the aforementioned fees, minus the $300,000 received from the State.

pensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675, attorney's fees could be recovered in an action for contribution between the parties responsible for the contamination of a landfill if the legal work was "closely tied to the actual cleanup." *Id.* at 820. DOC argues that, under this standard, fees incurred by Windsor to protect its interests after it relinquished principal responsibility for the investigation and remediation are not "closely tied" to the cleanup and hence cannot be recovered.

¶ 10. The trial court correctly held, however, that this case was an action under state law and was governed by state statutory and common-law principles. Although the Waste Management Act is silent on the issue of attorney's fees, it does provide generally that a responsible party may obtain "contribution or indemnification" from another responsible party, 10 V.S.A. § 6615(i), and further provides that this remedy is not intended to "preclude . . . any other civil or injunctive remedy" but rather is "in addition to those provided by existing statutory or common law." *Id.* § 6615(f). Although the general rule in Vermont, as elsewhere, is that parties bear their own attorney's fees and costs of litigation absent a statutory or contractual provision to the contrary, this Court has recognized an exception, rooted in principles of equity and fair dealing, when the wrongful act of one person has made it necessary for another person to become involved in litigation with a third party to protect his or her interests. See *Albright v. Fish*, 138 Vt. 585, 591, 422 A.2d 250, 254 (1980) ("[W]here the wrongful act of one person has involved another in litigation with a third person or has made it necessary for that other person to incur expenses to protect his interests, litigation expenses, including attorney's fees, are recoverable."); accord *Bull v. Pinkham Eng'g Assocs.*, 170 Vt. 450, 460-61, 752 A.2d 26, 34 (2000); *Wyatt v. Palmer*, 165 Vt. 600, 602, 683 A.2d 1353, 1356-57 (1996) (mem.); *Welch v. LaGue*, 141 Vt. 644, 646, 451 A.2d 1133, 1135 (1982).

¶ 11. The trial court properly applied this exception to hold DOC liable for the expenses incurred by Windsor to protect its interests during the cleanup operation. As the trial court noted, Windsor played virtually no role in the pollution caused by DOC and had no knowledge of its presence until July 1995. Nevertheless, as the court further found, Windsor remained a responsible party under the Waste Management Act, subject to potentially

enormous financial liability for the costs incurred by the State in remediating the site, regardless of Windsor's position that DOC should bear principal responsibility for the cleanup effort. See 10 V.S.A. § 6615(a)(4)(B) (responsible party may be liable for "costs of investigation, removal and remedial actions incurred by the state which are necessary to protect the public health or the environment"); *id.* § 6615(b) (party's failure to comply with state cleanup requirements could make it subject to penalty of three times the costs incurred by the State). Indeed, the record shows that DOC refused Windsor's request to assume full responsibility for the site, and the State consistently maintained the position that both DOC and Windsor continued to be liable for the costs of cleanup expended by ANR.

¶ 12. Accordingly, Windsor remained actively — and reasonably — involved in monitoring the ongoing cleanup efforts through its attorney and environmental consultants to protect its legal interests and to ensure that the work, principally performed by outside contractors, was thoroughly and efficiently executed. We agree with the trial court that Windsor was justified in maintaining a presence at all stages of the investigation and remediation to ensure that the work was done appropriately and to minimize exposure to future claims from DOC, the public, or ANR. As the court also noted, it was the pollution caused by DOC, not by Windsor, that required investigation and remediation. Therefore, the court correctly applied *Albright* in requiring DOC to compensate Windsor for attorney's fees incurred during the cleanup process.

¶ 13. The State's argument that *Albright* and its progeny do not apply because DOC was not found to be at "fault" is unpersuasive. Although the cases routinely refer to litigation expenses necessitated by the "wrongful act" of another, their rationale rests on principles of comparative responsibility and fairness, not fault. In *LaGue*, for example, we upheld an award of attorney's fees to a purchaser of land who had been compelled to intervene in a lawsuit by a third party that ultimately invalidated the seller's title. Although the seller had at all times "acted in good faith" and was unaware of the third party's claim at the time of the conveyance, his failure to convey good title had "of necessity involved" the innocent buyer in litigation to protect his interests and therefore entitled the buyer to recover his attorney's fees. 141 Vt. at 647, 451 A.2d at 1135; see also *Bull*, 170 Vt. at 461, 752

A.2d at 34 (upholding a judgment requiring an engineering firm to compensate a property developer for attorney's fees incurred in defending a lawsuit brought by the purchasers of a lot who were misled by the engineering firm's erroneous survey, notwithstanding the fact that the purchasers had not prevailed in their action against the firm and the developer). Nor do we find any meaningful distinction between fees incurred by a party to prosecute a civil suit and those incurred, as here, by a party to protect its interests in an administrative enforcement context. See *CNA Insurance Cos.*, 172 Vt. at 324, 779 A.2d at 667 (ANR directives requiring responsible parties to undertake investigative and remedial action to abate contamination were sufficiently adversarial in nature to constitute a "suit" under insurance policy, triggering duty to defend). Accordingly, we find no error in the court's award of attorney's fees.

¶ 14. The State also challenges the sufficiency of the evidence to support the attorney's-fee award. Our review of the claim is limited. "When determining an award of attorney's fees, the trial court must make a determination based on the specific facts of each case and, accordingly, we grant the trial court wide discretion in making that determination." *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 830 A.2d 675. In deciding what constitutes reasonable attorney's fees, courts generally start with the lodestar amount, consisting of the number of hours reasonably expended, multiplied by a reasonable hourly rate, and then adjusted upward or downward depending upon various factors. *Perez v. Travelers Ins. ex rel. Ames Dep't Stores, Inc.*, 2006 VT 123, ¶ 10, 181 Vt. 45, 915 A.2d 750. The trial court's decision shows that it painstakingly reviewed not only the summary of attorney's fees set forth in Exhibit 302 but also the somewhat more detailed original attorney's bills that comprised over 250 pages of Exhibit 542. Based upon its review, the court found that Windsor's attorney had billed a total of 1277 hours at $135 per hour (reduced from the attorney's usual rate of $150 per hour), plus expenses, for a total charge of $174,753.17. The court noted that this amount represented only a quarter of the total legal services provided, the result of a stringent paring down of charges to those strictly related to the cleanup.

¶ 15. Based on the exhibits and testimony, the court found that the hours billed were reasonable and that Windsor's attorney had exercised considerable prudence in his billing, charging less than

his usual hourly rate and the market rate. Although the court noted that the time attributed to some telephone calls may have been somewhat inflated, the court found that other work was not billed at all. While the court identified several additional problems with the summary of charges set forth in Exhibit 302 that rendered it a less than reliable source, it was satisfied from the evidence of the original invoices that Windsor was fairly billed for the work performed. The court also found that Windsor's attorney had handled the matter with "expertise," and concluded that Windsor had received "fair value" for the time shown in the original bills. Nevertheless, owing to the difficulty of deriving a precise, "accurate to the hour" figure for the time spent strictly on site management, the court determined that a reduction of the charges from $172,800 to $150,000 would reflect a "fair approximation" of the work performed and afford DOC "the benefit of all possible doubt [and] . . . be more than fair."

¶ 16. The State argues that evidence sufficient to demonstrate only a "fair approximation" of the charges cannot support an award of attorney's fees. The argument overlooks the court's finding that, despite the lack of minute detail in either the summary or the original bills, it was satisfied from all of the documentary evidence and testimony that $150,000 reflected a minimum of charges reasonably incurred for work attributable to site management, a figure that was "more than fair," indeed "[p]erhaps too fair" to the State. We have observed that, "[f]or purposes of an award of attorney's fees under Vermont law, the touchstone is reasonableness." *Perez*, 2006 VT 123, ¶ 13 (holding that evidence of attorney's fees in Vermont "need not reach the level of detail and justification required in federal bankruptcy proceedings"). The evidence here was sufficient to allow the court to reliably determine the minimal amount of work performed by Windsor's attorney relating to site management. This is all that the law requires. *Id.* Accordingly, we find no basis to disturb the court's attorney's-fee award.

¶ 17. We return, however, to the theory on which the award of attorney's fees was made. As we discussed above, § 6615(i) allows a responsible party to obtain indemnity from another responsible party and § 6615(f) maintains remedies provided by existing common law. The trial court found that Windsor was entitled to indemnity from DOC for attorney's fees under § 6615(i)

with *Albright* providing the standard for liability. We recognize that the right to recover attorney's fees under the *Albright* standard is a form of indemnity for the attorney's fees. Because it preexisted the enactment of § 6615(i), however, and is protected by § 6615(f), liability for the fees under *Albright* would exist even if § 6615(i) had never been enacted. We prefer to hold that Windsor can recover attorney's fees, pursuant to § 6615(f), under the *Albright* standard. We leave to another day whether indemnification, as provided in § 6615(i), includes attorney's fees, and if so, what the proper standard for recovery of such fees would be.

¶ 18. As we said at the outset, the *Albright* rationale may cover some of the consultant's expenses as litigation costs. We conclude, however, that a second rationale, indemnity under § 6615(i), covers these expenses in full. As we have held on a number of occasions, indemnity is based on the relationship between the parties and a determination of differential fault. Thus, "[g]enerally, indemnity will be imputed only when equitable considerations concerning the nature of the parties' obligations to one another or the significant difference in the kind or quality of their conduct demonstrate that it is fair to shift the entire loss occasioned by the injury from one party to the other." *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 29, 742 A.2d 734, 737 (1999). The special authorization for indemnity in § 6615(i) indicates a legislative determination that where there are "significant difference[s] in the kind or quality of [the] conduct" of responsible parties, indemnity is appropriate. *Id.* It is not unprecedented that differences in the kind and quality of conduct can give rise to indemnity even for strict-liability torts. Thus, even where the liability of a manufacturer of a product is based on strict liability in tort, it is required to indemnify the seller of the product to the consumer if the seller is found liable to the consumer but is not independently culpable. See Restatement (Third) of Torts: Apportionment of Liability § 22(a)(2)(ii) (2000); *Promaulayko v. Johns Manville Sales Corp.*, 562 A.2d 202, 205-06 (N.J. 1989); *Lowe v. Dollar Tree Stores, Inc.*, 835 N.Y.S.2d 161, 162 (App. Div. 2007) (applying common-law indemnity among distributors in the chain of distribution based on the policy of "shift[ing] the risk of loss to the party who can most efficiently control risk and distribute the attendant costs"); see generally D. Cetkovic, *Loss Shifting: Upstream Common Law Indemnity in Products Liability*, 61 Def. Couns. J. 75, 76 (1994) ("Common law indemnity

enables the burden for product safety to be shifted in accordance with free market principles as well as public policy interests."). Here, given that Windsor owns the facility that contains the hazardous waste but had no part in the disposal of that waste, and given that DOC formerly owned the facility and was responsible for disposing of the hazardous waste during its ownership, there is exactly the difference in kind and quality of conduct that gives rise to indemnity.

¶ 19. DOC argues, however, that even if indemnity applies, that indemnity does not cover the expenses incurred by Windsor but instead only the expenses incurred by ANR and recovered from Windsor pursuant to § 6615(a). In making this argument, DOC relies particularly on the language that responsible parties can be liable for "costs of investigation, removal and remedial actions" only if "incurred by the state." § 6615(a)(4)(B). In DOC's view, while the authorization for "costs of investigation" may cover the consultant expenses here, Windsor cannot recover the expenses from DOC because Windsor, and not ANR, incurred those expenses.

■ ¶ 20. We find this to be an overly limited construction of the statutory scheme. ANR has two options when confronted with a hazardous waste site. It can investigate the site, take removal and remedial actions, and then bring an action against the responsible parties to recover its costs. See *id.* § 6615(b). Alternatively, it can order the responsible parties to "take the necessary removal and remedial actions." *Id.* At least initially, ANR chose the latter course of action, directing the responsible parties to conduct the necessary investigations. DOC's argument is that Windsor could obtain indemnity if ANR incurred the investigation expenses and sought reimbursement, but not if ANR ordered Windsor to take the removal and remedial actions, in which case Windsor would necessarily incur investigatory expenses to determine how to take the required actions. See *Folino v. Hampden Color & Chem. Co.*, 832 F. Supp. 757, 763 (D. Vt. 1993) ("removal" includes actions necessary to monitor, assess and evaluate a release or threat of release of hazardous substances under CERCLA and 10 V.S.A. § 6615(a)(4)(B)). We think the indemnity provided by § 6615(i) must be coextensive with the responsible party's exposure. Thus, we agree with the trial court's holding that "Windsor's costs of investigation, to the extent they are deemed reasonable, are considered response costs."

¶ 21. We have a similar reaction to DOC's final argument that even if Windsor can recover expenses connected with investigation if it faces a potential order to clean up the site, it cannot recover those expenses if DOC or ANR assumed the obligation to investigate the site and determine the method of remediation, so that Windsor's expenses were duplicative and incurred only to advance its position that it should not be required to remediate. The trial court rejected this argument because DOC refused to accept sole responsibility for remediation of the site, thus leaving Windsor potentially liable for these expenses and still under an order from ANR to investigate what was necessary to remediate it. It held, however, that it would determine whether the consultant's expenses were reasonable under the circumstances, considering whether they were duplicative. The trial court reiterated its holding in its damages ruling and went through each of the expense items, eventually reducing the requested amount by $94,400.

¶ 22. We find the trial court's ruling to be reasonable under the circumstances. As long as Windsor remained potentially liable and under an order to investigate what was necessary to remediate the site, Windsor reasonably incurred expenses, including those incurred to monitor the work being done on DOC's behalf, to protect its interests and discharge its responsibilities. DOC was properly required to indemnify Windsor for those expenses that the trial court found were reasonable.

II.

¶ 23. Windsor next contends that the court erred in rejecting its alternative theories of liability premised on the Vermont Groundwater Protection Statute, 10 V.S.A. § 1410, and common-law implied indemnity. We will discuss these claims only briefly because we conclude that reversal of the trial court decision would grant Windsor no further relief. Thus, any error in the trial court ruling is harmless as a matter of law.

¶ 24. As this case reaches us, Windsor's requested relief is reimbursement for the attorney's fees, consultant's fees, and interest that it incurred in connection in investigating the site and monitoring the remedial action, along with attorney's fees for this indemnity action. Except for the attorney's fees for this action, Windsor obtained the bulk of what it requested from the trial

court. To the extent Windsor did not obtain the full amount it requested, it was because the trial court found the expenses were not sufficiently documented, were unreasonable, or were incurred for other purposes. Recovery under the additional theories Windsor raises would make no difference to the recovery amount and would not affect the ruling on attorney's fees for this action.

¶ 25. In its complaint, Windsor initially requested damages for the "depreciation in the market value of its property." As the litigation went forward, however, it became clear that Windsor was seeking only the same fees and expenses claimed under § 6615(i). Windsor's brief to this Court makes no mention of depreciation in the value of its property or any other damages different from those sought for the indemnity claim. For example, in its reply brief, Windsor argued that DOC should be liable for "all of [Windsor's] costs and expenses under Vermont Groundwater Protection statute." In appellant's brief, Windsor seeks only "restitution of each item of expense itemized on Exhibits 301-305." Because the relief that could be obtained under Windsor's alternative theories would be duplicative of that already obtained on the indemnity theories adopted by the trial court and affirmed above, we do not reach the merits of whether the alternative theories were properly dismissed.

### III.

¶ 26. Windsor next contends that the court erred in denying its claim for attorney's fees, alleged to be in excess of $466,000, incurred in prosecuting the instant action. We find no error. "Our standard for departing from the 'American Rule' with regard to attorney['s] fees, under which parties must bear their own attorney['s] fees absent a statutory or contractual exception, is demanding." *Concord General Mutual Insurance Co. v. Woods*, 2003 VT 33, ¶ 18, 175 Vt. 212, 824 A.2d 572 (quotation omitted). The Waste Management Act is silent on the issue of attorney's fees in indemnification actions pursuant to § 6615(i). We have, however, recognized a common-law exception to the American Rule, based on principles of equity and fair dealing, to allow a party to be indemnified for legal expenses incurred in litigating a suit brought about by the actions of a third party. *Albright*, 138 Vt. at 591, 422 A.2d at 254. The trial court employed this rule in allowing Windsor to collect the attorney's fees incurred in connection with its duties as a responsible party under § 6615(a).

■ ¶ 27. This principle has not, however, been extended to permit the recovery of attorney's fees incurred in prosecuting the action to recover the legal expenses sustained in defending the third-party action. Like all exceptions to the general rule that attorney's fees are the normal incidents of litigation and must be borne by the party that incurs them, the *Albright* exception must be narrowly construed. As the New York Court of Appeals explained in rejecting a claim similar to Windsor's: "we could not adopt such a rule without simultaneously disparaging the fundamental principle that the prevailing litigant is ordinarily not entitled to collect a reasonable attorney['s] fee from the loser." *Chapel v. Mitchell*, 642 N.E.2d 1082, 1084 (N.Y. 1994) (quotation omitted); see also *Dale Bland Trucking, Inc. v. Kiger*, 598 N.E.2d 1103, 1105 (Ind. Ct. App. 1992) (holding that, although lease agreement entitled trucking company to be indemnified by employer for attorney's fees incurred in defending action by injured employee, the general rule requiring each party to pay for its own attorney's fees precluded the company's claim for "attorney's fees incurred in prosecuting th[e] declaratory indemnity action").

■ ¶ 28. Although we have not previously considered this precise issue, we reached a similar conclusion, albeit in a slightly different context, in *Woods*. In that case, an insurance company instituted a declaratory-relief action against its insured seeking a declaration that its homeowner's policy did not cover certain injuries sustained on the insured's property. In reversing a summary judgment for the insurer, we held that the insured was entitled to coverage, but was not entitled to recover its legal expenses incurred in defending the declaratory-relief action. 2003 VT 33, ¶ 18. Our holding was consistent with the widely-held rule that an insured is not entitled to recover attorney's fees incurred in a declaratory-relief action to establish the insurer's duty to defend or indemnify. *Patterson v. Ins. Co. of N. Am.*, 85 Cal. Rptr. 665, 669 (Ct. App. 1970); accord *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004) (under Alabama law, "insured may not recover its attorney['s] fees from the insurer if the fees were incurred in a declaratory judgment action to determine coverage under a liability policy"); *W. Am. Ins. Co. v. AV & S*, 145 F.3d 1224, 1230-31 (10th Cir. 1998) (applying same rule under Utah law); *Reis v. Aetna Cas. & Sur. Co.*, 387 N.E.2d 700, 709 (Ill. App. Ct. 1978) (although liable for legal expenses sustained by insured in defending third-party

action, insurer was "not liable for the attorneys' fees incurred by the insured in pursuing the declaratory judgment action" to establish its duty to defend); see generally J. Draper, Annotation, *Insured's Right to Recover Attorneys' Fees Incurred in Declaratory Judgment Action to Determine Existence of Coverage Under Liability Policy*, 87 A.L.R.3d 429 (1978). This same principle applies to bar Windsor's recovery of attorney's fees incurred in bringing suit against DOC.

¶ 29. In a related vein, Windsor contends that the trial court erred in denying its claim for attorney's fees of approximately $85,000 incurred in suing its insurers Hartford Insurance Company and CNA Insurance Company for benefits to cover defense costs related to the cleanup. As discussed above, Windsor may be indemnified under a narrow exception to the American Rule for the legal expenses reasonably and necessarily incurred in protecting its interests during the environmental cleanup process, but attorney's fees expended in a declaratory relief action against its insurers are collateral to this end and are not recoverable.[6]

## IV.

¶ 30. Windsor also claims that the court erred in denying its request for prejudgment interest. As we have explained, prejudgment "interest is awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other forms of damage." *Newport Sand & Gravel Co. v. Miller Concrete Constr., Inc.*, 159 Vt. 66, 71, 614 A.2d 395, 398 (1992). The rationale for awarding prejudgment interest as of right is that "where damages are liquidated or determinable by a reasonably certain standard of measurement, the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages." *Agency of Natural Resources v. Glens Falls Ins. Co.*, 169 Vt. 426, 435, 736 A.2d 768, 774 (1999) (quotation omitted).

¶ 31. The trial court correctly determined that prejudgment interest was not mandatory in this case. As the court found, and

---

[6] Windsor would fare no better with its argument under common-law indemnity or under the Groundwater Protection Statute. The reasons for denying recovery of the fees with respect to indemnity under § 6615(i) apply equally to a common-law-indemnity claim. The Groundwater Protection Statute, 10 V.S.A. § 1410(c), provides for the recovery of damages, but not for the recovery of attorney's fees.

the record plainly showed, the fees that Windsor claimed to have incurred for engineering and legal services were the subject of considerable dispute and conflicting evidence at trial, and the court ultimately awarded substantially less than Windsor sought. See *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 37, 181 Vt. 513, 928 A.2d 497 (holding that prejudgment interest was not mandatory where amount claimed was the subject of "much controversy at trial"); *Glens Falls*, 169 Vt. at 435, 736 A.2d at 774 (plaintiff was not entitled to prejudgment interest as a matter of right where amount of damages was "the subject of considerable uncertainty and dispute"). Nor did the court abuse its discretion in determining that such an award was not required "to avoid injustice." *Estate of Fleming v. Nicholson*, 168 Vt. 495, 500, 724 A.2d 1026, 1029 (1998). As the court observed, Windsor had funded its litigation expenses through bank loans and the court awarded the interest charges on the loans as a separate category of damages totaling $104,102.52. Accordingly, the court reasonably concluded that there was no injustice in Windsor's remedy. We thus find no basis to disturb the ruling.[7]

## V.

¶ 32. Finally, the State contends that the court erroneously invoked the "collateral-source rule" in declining to offset Windsor's damages against Windsor's net recovery of insurance benefits, acknowledged to be in excess of $470,000, from Hartford and CNA. The collateral-source rule operates "to deny to a defendant a setoff for payment the plaintiff receives from a third, or collateral, source." *Hall v. Miller*, 143 Vt. 135, 141, 465 A.2d 222, 225 (1983). Most commonly applied where an insurance company has made a payment to compensate the plaintiff for his or her injuries, "the collateral[-]source rule prevents the defendant wrongdoer from benefiting from the plaintiff's foresight in acquir-

---

[7] Our holding renders it unnecessary to address the State's alternative argument that the prejudgment interest was barred by sovereign immunity. Nor need we consider Windsor's claim, raised for the first time in its reply brief, that a stipulation entered into between the parties showing the amount of prejudgment interest that would be due on the court's damage award somehow constituted a waiver of the issue by the State. See *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 1 n.2, 176 Vt. 356, 848 A.2d 310 (arguments raised for the first time in a reply brief need not be considered). In any event, the stipulation was plainly not a waiver of the issue, but merely an agreement between the parties as to the amount of interest that would be due if the court ruled in Windsor's favor.

ing the insurance through any offsetting procedure." *Id.* at 141-42, 465 A.2d at 225. While the rule may result in plaintiff's obtaining a "double recovery," *id.*, its essential purpose is not to provide the plaintiff a windfall but to prevent the wrongdoer from escaping liability for his or her misconduct. See *id.* at 142, 465 A.2d at 226 ("The thief who takes my property cannot escape liability to me simply because some insurance company, or my friends, or neighbors, have compensated me for my loss. . . .") (quotation omitted); see generally J. Branton, *The Collateral Source Rule*, 18 St. Mary's L.J. 883, 889 (1987) ("For those who view [the rule] objectively, the question becomes, as between a wrongdoer and an innocent victim, who is to get the alleged 'windfall.' "); Note, *Unreason in the Law of Damages: The Collateral Source Rule*, 77 Harv. L. Rev. 741, 748 (1964) ("If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing." (quotation omitted)).

¶ 33. Observing that we have not limited the rule to the tort context, the trial court here opined that the critical "question for the application of the collateral[-]source rule is whether the defendant is connected with the payment or indemnification in any way" and found that, as DOC had no connection with the insurance payments, the rule applied to bar a setoff in this case. DOC contests this finding, asserting a connection to the insurance proceeds through state financial assistance that facilitated Windsor's purchase of the insurance policies. DOC also argues that the collateral-source rule should not apply here where its liability is determined without a finding of fault.

¶ 34. We start with the second argument. Like other tort principles, the collateral-source rule is premised on certain policy goals. As suggested earlier, foremost among these is the fundamental tenet that a defendant should be required to pay for his or her wrongdoing. Indeed, this has been the touchstone of the rule in Vermont for more than a century. As we observed in *Harding v. Town of Townshend*, 43 Vt. 536, 539 (1871): "as between the insurer and the wrong-doer, . . . . [t]he party whose wrongful act or culpable negligence caused the injury ought to make compensation and bear the loss." Thus, as courts and commentators have observed, one of the essential elements of the rule has always been its punitive nature. See, e.g., *Dennison v. Head Constr. Co.*, 458 A.2d 868, 875 (Md. Ct. Spec. App. 1983)

("The collateral source rule is punitive . . . .") (quotations omitted); *Hubbard Broad., Inc. v. Loescher*, 291 N.W.2d 216, 222 (Minn. 1980) (observing of the collateral source rule that "its purpose is punitive"); Restatement (Second) of Torts § 920A cmt. b (1979) (noting the "element of punishment of the wrongdoer involved" in the collateral-source rule).

■ ¶ 35. A close corollary of this policy goal is the related goal of deterring wrongdoing. As the Wisconsin Supreme Court recently explained: "The collateral[-]source rule, like other tort principles, also aims at deterring a tortfeasor's negligent conduct. Accordingly, it makes the tortfeasor fully responsible for damages caused as a result of tortious conduct." *Leitinger v. DBart, Inc.*, 2007 WI 84, ¶ 33, 736 N.W.2d 1; see also *State Farm Mut. Auto. Ins. Co. v. Nalbone*, 569 A.2d 71, 73 (Del. 1989) ("The rationale for the collateral[-]source rule appears to emphasize the deterrent and quasi-punitive functions of tort law."); *Cook v. Jefferson Parish Hosp.*, 900 So. 2d 865, 866 (La. Ct. App. 2005) ("The major policy reason for applying the collateral[-]source rule to damages has been, and continues to be, tort deterrence."); *State ex rel. Stacy v. Batavia Local Sch. Dist.*, 829 N.E.2d 298, 307 (Ohio 2005) (observing that the collateral-source rule "is intended to have both a punitive and deterrent effect on the tortfeasor"); J. Moorhouse, et al., *Law & Economics and Tort Law: A Survey of Scholarly Opinion*, 62 Albany L. Rev. 667, 688 (1998) (observing that the first major justification of the collateral-source rule is that "tortfeasors must pay the full costs of their actions"); Note, *Preserving the Collateral Source Rule: Modern Theories of Tort Law and a Proposal for Practical Application*, 47 Case W. Res. L. Rev. 1075, 1078 (1997) ("unless the defendant is made to pay for the damages caused, the deterrent purposes of tort liability will be undermined"); Note, *The Collateral Source Rule in Georgia: A New Method of Equal Protection Analysis Brings a Return to the Old Common Law Rule*, 8 Ga. St. U. L. Rev. 835, 840 (1992) (the collateral-source rule developed out of "recognition that punitive measures against the tortfeasor would promote deterrence of tortious conduct").

¶ 36. DOC relies on those principles, arguing that since it has been found strictly liable, but not negligent, application of the collateral-source rule to it would be inconsistent with the policies behind it. DOC asserts that, absent any finding of fault or wrongdoing on its part, no punitive or deterrent purpose would be

served by requiring that it reimburse Windsor for damages already received from another source. See *Dennison*, 458 A.2d at 874 (holding that, because an award of workers'-compensation benefits "does not involve questions of wrongdoing," the collateral-source rule did not prevent the state from reducing state benefits where the worker received federal benefits for the same injuries); *Batavia Local Sch. Dist.*, 829 N.E.2d at 308 (holding that application of collateral-source rule to offset backpay award against state retirement benefits would have no deterrent effect where award resulted from violation of collective bargaining agreement which involved "neither discrimination nor tortious conduct"); see generally V. Schwartz, *Tort Law Reform: Strict Liability and the Collateral Source Rule Do Not Mix*, 39 Vand. L. Rev. 569, 572 (1986) (observing that, because "the collateral[-]source rule is a fault-based concept," it has no application when damages are based on strict liability).

¶ 37. The problem with DOC's argument is that this is an indemnity action, not a strict-liability action under the Waste Management Act. Thus, Windsor is able to recover at least part of its expenses because there is a difference between the kind or quality of DOC's conduct and that of Windsor. The trial court found that Windsor was an entirely innocent and unknowing owner of the property. DOC, on the other hand, created and used the dipping operation that caused the hazardous waste and passed the property on to Windsor without informing it of the existing pollution. Whether or not DOC is found negligent, it is clearly more at fault than Windsor, and that is the basis for the liability ruling requiring DOC to indemnify Windsor.

¶ 38. The circumstances here are comparable to those in *Hall v. Miller*. In that case, plaintiff farmer bought diseased cows from defendant, cattle dealer, and they had to be destroyed. Plaintiff brought a breach-of-warranty action and prevailed, but defendant sought to reduce the judgment by the amount plaintiff received from state and federal indemnification programs. Just like DOC, defendant argued that he was not a "wrongdoer," because "this is not a tort action but one based on contract" and the disease was "latent" so that the breach of warranty was not "shown to be intentional or even manifest." *Hall*, 143 Vt. at 143, 465 A.2d at 226. We rejected that argument:

> [T]he collateral[-]source rule should apply to actions sounding in contract, as well as in tort. The breaching

> party in a contract action or, as here, a breach of warranty action, may not be a wrongdoer in the same sense as is a tortfeasor. Nonetheless, as between the two parties, it is better that the injured plaintiff recover twice than that the breaching defendant escape liability altogether.

*Id.* Just as the application of the collateral-source rule was based on differential fault in *Hall*, it applies because of differential fault here.

¶ 39. DOC makes two other arguments about why the collateral-source rule should not apply. The first is that the rule should not allow a double recovery, particularly where DOC gave the property to Windsor for a dollar and DOC assumed the full obligation for the cleanup. While we understand DOC's view that its liability has become excessive, we find nothing in the policy behind the collateral-source rule that would deny its applicability for the reasons stated by DOC.

¶ 40. Finally, we reject DOC's second argument that the collateral-source rule should not apply because the state education department has given grants to Windsor under applicable state aid to education formulas. For this reason, DOC argues, the insurance policies from which Windsor received payments were not a source "wholly independent from the defendants." *Id.* at 144, 465 A.2d at 227. While we understand that the State has subsidized the operating expenses of school districts, we cannot say that the insurance was purchased because of that subsidization. In circumstances where an agency of the federal government was the tortfeasor, the federal courts have generally applied the collateral-source rule to Social Security benefits because of the plaintiff's contribution to the creation of those benefits. See *Berg v. United States*, 806 F.2d 978, 984 (10th Cir. 1986). An important consideration behind the collateral-source rule is that a wrongdoer should not benefit "from the plaintiff's foresight in acquiring the insurance." *Hall*, 143 Vt. at 141-42, 465 A.2d at 225; see *My Sister's Place v. City of Burlington*, 139 Vt. 602, 613, 433 A.2d 275, 281 (1981) ("tortfeasor should not reap the benefits of a victim's providence"). While the State may have subsidized Windsor's operating expenses, the decision to purchase the insurance was entirely that of Windsor. We conclude that the provision of state aid to education does not make Windsor's insurance benefits other than a collateral source.

¶ 41. For the above reasons, we agree with the trial court that Windsor's insurance proceeds were a collateral source. Under the collateral-source rule, DOC may not reduce its indemnity liability to Windsor by the amount of Windsor's insurance proceeds.

*Affirmed.*