2011 VT 125

**SEC AMERICA, LLC v. MARINE ELECTRIC SYSTEMS, INC.**

[39 A.3d 1054]

No. 10-436

¶ 1. November 10, 2011. The parties to this contract dispute appeal separately from a trial court order awarding damages in excess of $78,000 to plaintiff SEC America (SEC). Defendant Marine Elec-

tric Systems, Inc. (MES) contends the court erred in: (1) failing to reduce the damage award for partial payment; (2) granting an award for lost profits; and (3) relying on inadmissible evidence. SEC asserts the court erred in concluding that it acted unreasonably in failing to mitigate damages. We affirm.

¶ 2. This case arose out of a transaction to supply an electrical component for installation in jamming devices to be used by NATO forces in Afghanistan to disrupt the remote detonation of improvised explosive devices (IEDs). The facts may be briefly summarized. Additional material facts will be set forth in the discussion that follows. In 2007, NATO was involved in discussions with a company called EMW to purchase a jammer known as the MILJAM 350. The technology for this device belonged to an Israeli company owned by one Alon Wallach. To comply with NATO rules prohibiting purchases from companies domiciled in non-NATO countries, Wallach arranged with MES, a defense contractor in New Jersey, to purchase the MILJAM 350 technology and manufacture the jammers in the United States.

¶ 3. The jammers required a power supply or converter. To obtain this component, Wallach put MES's owner, Harry Epstein, in touch with Wallach's distant relative, Ethan Herz, who owns SEC, an engineering firm in South Burlington that manufactures electrical power-supply units for a variety of industrial applications. SEC's model 695 DC converter appeared to be suitable, and the three men had discussions concerning necessary modifications to the converter case and the placement of cable connections for use in the jammer. In December 2007, MES submitted a purchase order for seventeen converter units, followed by a second amended purchase order in February 2008 for the original seventeen-unit order at $2200 each, or $37,400, together with an additional order for twenty-nine units at $1975 each, or $57,275, for a total purchase price of $94,675.

¶ 4. SEC shipped the first seventeen units in March 2008, and continued production on the remaining twenty-nine, which consisted of obtaining printed circuit boards or motherboards and loading or stuffing them with the necessary electronic components. By mid-April 2008, SEC had not been paid for any of the shipped units. Herz contacted Epstein, who said that SEC would be paid when he (Epstein) was paid. Herz then stopped production on the remaining twenty-nine units. It turned out that the deal between EMW and NATO had collapsed, and EMW consequently refused to purchase the jammers from MES. MES sued EMW and others, which resulted in an eventual settlement in March 2009, but none of the proceeds went to SEC.

¶ 5. In August 2008, SEC filed this lawsuit against MES for breach of contract. Following a bench trial, the court found in favor of SEC, awarding the unpaid contract price of $37,400 for the seventeen units shipped, lost profits of $23,275 for the twenty-nine incomplete units, and prejudgment interest of $17,595.75, for a total award of $78,270.75. MES appealed, and SEC filed a separate cross-appeal.

¶ 6. MES concedes on appeal that the parties entered into a valid contract for the purchase and sale of the initial seventeen converter units but claims that any damages for breach of the contract should have been reduced by $15,000 that SEC received from Wallach and later returned. MES argues that the trial court erred in accepting Herz's characterization of this money as a "loan" rather than as a partial payment, and asserts that SEC was obligated to retain the money to mitigate its damages.

¶ 7. Regardless of whether the trial court properly characterized the money as a loan or a payment, the evidence amply supports the trial court's finding

that, once the initial introductions from Wallach had been made, "[t]he entire transaction . . . took place between MES and SEC" with "MES [as] the intended purchaser and SEC [as] the intended seller during all material times in this transaction" without any involvement of Wallach as a party to the agreement. It is axiomatic that a seller is not obligated to accept payment by a nonparty to the contract. See generally 28 R. Lord, Williston on Contracts § 72:35, at 764-65 (4th ed. 2003) (observing that tender of payment "by a third party who is a stranger to the contract, unless subsequently ratified by the debtor, will ordinarily be held invalid" and that "whatever the effect of payment by a stranger when accepted by the creditor, it is clear that the creditor is under no obligation to accept such a payment in the first instance"); see also *Brabham v. Am. Nat. Bank of Union Springs*, 689 So. 2d 82, 87 (Ala. Civ. App. 1996) ("A tender of payment by a stranger to a contract is normally invalid."); *Swain v. Kayko*, 205 N.W.2d 621, 624 (Mich. Ct. App. 1973) (stating that "[g]enerally, a mere stranger to an obligation cannot make an effectual tender" and that consequently "[a]s a matter of law, a party to a contract has a right to demand payment from the other party to the contract"); *Chelius v. Questar Microsystems, Inc.*, 27 P.3d 681, 684 (Wash. Ct. App. 2001) ("Unless a creditor consents, a debtor cannot avoid liability for a debt by obtaining a third party's agreement to pay it."). Accordingly, SEC was not legally obligated to accept the $15,000 tender from Wallach, and the trial court therefore correctly declined to reduce the damage award by that amount.

¶ 8. MES also raises several claims concerning the award in connection with the twenty-nine additional converter units. First, MES asserts that SEC was not entitled to damages because it never accepted the revised purchase order for the twenty-nine units, so that no contract was formed. Vermont has adopted the liberal standards set forth in the Uniform Commercial Code for the formation of a sales contract: "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 9A V.S.A. § 2-204(1). The requisites for an offer and acceptance are equally flexible. Thus, the submission of a purchase order is generally considered to be an offer to purchase which the seller may then accept or reject. See *L.V. Appleby, Inc. v. Griffes*, 160 Vt. 601, 602, 648 A.2d 808, 809 (1993) (mem.) (holding that "[s]ubmission of the purchase order . . . was an offer to purchase"); accord *Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1300 (Ohio Ct. App. 1982) ("Generally, the submission of a purchase order is viewed as being an offer which may then be accepted or rejected by the seller.").

¶ 9. Unless clearly indicated otherwise, an offer "shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." 9A V.S.A. § 2-206(1)(a). Performance by the seller has been recognized under this standard as a reasonable mode of acceptance. See *Appleby*, 161 Vt. at 602, 648 A.2d at 809 (noting that trial court did not err in finding that "by filling the [purchase] order and billing defendant, plaintiff accepted defendant's offer in a reasonable manner"); accord *Philip Schwartz, Inc. v. Gold Coast Graphics, Inc.*, 623 So. 2d 819, 820 (Fla. Dist. Ct. App. 1993) (holding that when buyer "submitted the purchase order to the printer it was making an offer" and that "[t]he printer's performance constituted the acceptance of the offer, and thus, a contract"); *Nasco, Inc. v. Dahltron Corp.*, 392 N.E.2d 1110, 1116 (Ill. App. Ct. 1979) (holding that manufacturer validly accepted purchase order when it "began preparation for the production" of or-

dered units and buyer "knew that [manufacturer] was beginning production"); *Am. Bronze Corp.*, 456 N.E.2d at 1300 (holding that manufacturer's performance was "a reasonable mode of acceptance" of purchase order and therefore "the agreements became binding at the moment production began").

¶ 10. The trial court here found that MES submitted a revised purchase order for the twenty-nine additional units in mid-February of 2008, and that by mid- to late March of 2008 SEC "had the essential materials on hand and was working on production." The court also found that, during this period of time, officers from both companies were exchanging emails discussing labels and other specifications relating to the additional twenty-nine units. These included statements from SEC indicating that it expected "the second batch" of converters to "go much faster" and that certain materials had arrived for the second order, and from MES containing suggestions for the "next batch" of twenty-nine units. SEC also submitted evidence of the materials that it had ordered and the costs that it had incurred in connection with the production of the additional units. The evidence was thus sufficient to show that SEC had commenced production of the twenty-nine units and that MES was aware of it, and this, in turn, was sufficient under the law to constitute an acceptance of the revised purchase order and create a valid contract. See *Rubin v. Sterling Enters., Inc.*, 164 Vt. 582, 588, 674 A.2d 782, 786 (1996) (we will not disturb trial court's findings if supported by any credible evidence, nor its conclusions if reasonably supported by findings and law).

¶ 11. MES also summarily claims that no valid contract could have been formed for the twenty-nine units because the purchase order failed to contain "the essential term of time for delivery." The absence of one or more terms, however, will not cause a contract to "fail for indefi-

niteness" where the parties intended to make a contract and "there is a reasonably certain basis for giving an appropriate remedy." 9A V.S.A. § 2-204(3). Furthermore, "[t]he time for shipment or delivery or any other action under a contract if not . . . agreed upon shall be a reasonable time." *Id.* § 2-309(1); see *Appleby*, 160 Vt. at 601-02, 648 A.2d at 809 (affirming trial court's finding that seller's performance constituted acceptance and formation of contract despite absence of date of delivery in purchase order); accord *Autonumerics, Inc. v. Bayer Indus., Inc.*, 696 P.2d 1330, 1336 (Ariz. Ct. App. 1984) (holding that absence of delivery date in purchase order was not fatal to contract formation under statutory provision that time for delivery, if not agreed upon, shall be reasonable time); *Southern Utils., Inc. v. Jerry Mandel Mach. Corp.*, 321 S.E.2d 508, 510 (N.C. Ct. App. 1984) (where time for delivery was left open, "under the governing Code provision, plaintiff was to pay and defendant to deliver within a reasonable time"). Accordingly, we find no merit to the claim.

¶ 12. MES also argues on several grounds that the trial court erred in awarding SEC its lost profits as damages for MES's repudiation of the twenty-nine units. The measure of damages for a nonacceptance or repudiation of a sale of goods is generally "the difference between the market price at the time and place for tender and the unpaid contract price." 9A V.S.A. § 2-708(1). Where this remedy is "inadequate," however, the measure of damages is the "profit . . . which the seller would have made from full performance by the buyer." *Id.* § 2-708(2). There was ample evidence here that the contractually specified configuration of the case and connections for use in the jammer devices was sufficiently unique that there was no standard resale market, so that the court's reliance on § 2-708(2) was justified. See, e.g., *First Tenn. Bank Nat'l Ass'n v. Hurd Lock &*

*Mfg. Co.*, 816 S.W.2d 38, 42 (Tenn. Ct. App. 1991) (reaffirming general rule allowing "recovery of lost profits under circumstances where there was no available market"); *Kenco Homes, Inc. v. Williams*, 972 P.2d 125, 128 (Wash. Ct. App. 1999) (noting that, "[i]n general, the adequacy of damages under [§ 2-708] subsection (1) depends on whether the nonbreaching seller has a readily available market on which he or she can resell the goods that the breaching buyer should have taken"). MES asserts that the lost profits measure was inconsistent with the court's further finding that SEC unreasonably failed to mitigate its damages by either selling the stripped or unstuffed circuit boards or incorporating them into other converters and recouping its costs to that extent. MES confuses resale of a component, however, with resale of the finished product, and we find no inconsistency in the court's conclusion that lost profits was the proper measure of damages for the twenty-nine converter units.[1]

---

[1] MES also claims in passing that SEC failed to exercise reasonable commercial judgment in failing to complete manufacture of the twenty-nine units, and that its recovery should be limited to what it would have made if it had sold the units to other buyers. The argument is inconsistent with the evidence and finding, noted earlier, that the units were uniquely configured and therefore not amenable to resale. In addition, MES summarily claims that, although the court credited MES with about $10,000 in parts that SEC was able to salvage and reuse, the court should have applied an additional credit for the profit that SEC allegedly made in selling the units with the salvaged parts. MES has not shown how or why it is entitled to an additional credit for the resale of the finished product that included the salvaged components, and we therefore find no error.

¶ 13. MES further claims that the document on which the court relied in calculating SEC's lost profits, plaintiff's Exhibit 13, was erroneously admitted as a "summary" of SEC's costs of production without a proper foundation, as required by Rule 1006 of the Vermont Rules of Evidence. Whatever the merits of the claim, the record shows that MES also submitted a "Parts List" (defendant's Exhibit V) enumerating the parts and costs incurred in production of the twenty-nine units that was largely identical to the information contained in Exhibit 13. The trial court expressly relied on both exhibits in its damage discussion. Accordingly, any error in the admission of Exhibit 13 was harmless. See *Wells v. Rouleau*, 2008 VT 57, ¶ 15, 184 Vt. 536, 955 A.2d 518 (mem.) (holding that any error in admission of document was harmless where it was cumulative of other properly admitted evidence).

¶ 14. Finally, MES contends the court erred in awarding prejudgment interest on that portion of the award for lost profits. We find no error. The contract price for the twenty-nine units was fixed, and the costs of production were known at the time of the breach, so that the damages were readily ascertainable. See *Estate of Fleming v. Nicholson*, 168 Vt. 495, 501, 724 A.2d 1026, 1031 (1998) (reaffirming rule that prejudgment interest is mandated where "damages are liquidated or reasonably ascertainable"). MES's reliance on *Bull v. Pinkham Engineering Assocs.*, 170 Vt. 450, 752 A.2d 26 (2000), is misplaced. There, we affirmed a trial court order denying prejudgment interest on a lost-profit award where, on the facts presented, there was no basis to conclude that the damages were readily ascertainable. *Id.* at 464, 752 A.2d at 36. Although we cited to a Missouri case holding that prejudgment interest is generally not allowed for lost profits, *Investors Title Co. v. Chicago Title Insurance Co.*, 983 S.W.2d 533, 538 (Mo. Ct.

App. 1998), we specifically declined to issue "a general ruling" on the point, 170 Vt. at 464, 752 A.2d at 36, and the Missouri case itself distinguished an earlier decision upholding an award of prejudgment interest where the lost-profit damages were reasonably ascertainable. *Investors Title*, 983 S.W.2d at 538 (citing *Schmidt v. Morival Farms, Inc.*, 240 S.W.2d 952, 961 (Mo. 1951), where the court rejected claim that damages for lost profits were "not definitely capable of ascertainment"); see also *Hall v. Miller*, 143 Vt. 135, 146, 465 A.2d 222, 228 (1983) (rejecting claim that damages for lost profits for breach of contract "could not be 'established with reasonable certainty'" and upholding award of prejudgment interest). Accordingly, we find no error in the award of prejudgment interest.

¶ 15. In its cross-appeal, SEC contends the court erred in finding that it acted in a commercially unreasonable manner in failing to mitigate damages. To recall, the court found that SEC stopped production for nonpayment by late April or early May of 2008, and further found that it must have been clear to SEC by the summer of 2008 "that no export license [for the jammers] would issue" and that in all probability the NATO purchase "was a dead issue." The court concluded that SEC had a duty to mitigate at that point, and that it was commercially unreasonable to fail to sell or incorporate the stripped circuit boards for the twenty-nine units into other converters. Accordingly, the court reduced SEC's damages by the amount that would have been saved had it done so.[2]

¶ 16. SEC has not challenged the court's factual findings, but argues that countervailing evidence — in particular MES's promise to pay SEC when it was

paid, and MES's lawsuit against EMW for nonpayment that was not settled until March 2009 — made it reasonable for SEC to suspend production and essentially sit on the incomplete circuit boards for almost a year. The weight to be accorded the evidence in determining whether SEC acted reasonably in failing to mitigate lies within the trial court's discretion. See, e.g., *Cesco Mfg. Corp. v. Norcross, Inc.*, 391 N.E.2d 270, 272-73 (Mass. App. Ct. 1979) (setting forth trial court's finding that seller "acted in a commercially reasonable manner [when] it sought to minimize damages by ceasing production" and noting that court's findings cannot be set aside "unless clearly erroneous"); see also *Wilk Paving, Inc. v. Southworth-Milton, Inc.*, 162 Vt. 552, 557, 649 A.2d 778, 782 (1994) (holding that whether buyer's continued use of product after revocation was a reasonable "good faith attempt to mitigate damages" was "a question of fact" for trial court's consideration). Although SEC urges that it was entitled to hope that a positive conclusion of the lawsuit would ultimately lead to its payment and completion of the twenty-nine converters, sufficient evidence supports the trial court's conclusion that it was unreasonable to do nothing for a year, during which time the circuit boards became obsolete. Accordingly, we find no clear error to compel reversal of the judgment.

*Affirmed.*

---

[2] By 2009, SEC was using a new circuit board in its standard converter units that rendered obsolete the older boards purchased for the twenty-nine units.