Filed 12/16/25

VERMONT SUPERIOR COURT

Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 25-CV-01524

---

Casella Waste Systems Inc. v. Solmax Geosynthetics, LLC

---

## DECISION AND ORDER ON PLAINTIFF'S SECOND RENEWED MOTION TO STAY ARBITRATION

In this action for declaratory and monetary relief, Plaintiff Casella Waste Systems, Inc. ("Casella") claims that Defendant Solmax Geosynthetics, LLC ("Solmax") sold defective needle-laden geosynthetic clay liner ("GCL") for two of Casella's landfill projects. The parties disagree about whose terms and conditions control the transaction and whether they are required to arbitrate their dispute. Casella moved the Court to stay arbitration proceedings that Solmax initiated in Texas pending the outcome of this decision.

On June 30, 2025, the Court granted a temporary stay pending a hearing. On September 29, 2025, the Court conducted a hearing at which it took evidence and heard testimony from witnesses Samuel Nicolai, Kenneth Gelting, Debora McPhee, and Michael Winterbourne.

### Findings of Fact

The Court makes the following findings of fact by a preponderance of the evidence unless otherwise noted. Casella is a waste management company that manages residential, industrial, and commercial waste materials. Samuel Nicolai was employed by Casella for eleven years as Vice President of Engineering and Compliance. He managed 9 active landfills and 10 closed facilities.

Biosynthetics are used for lining, separating, and draining landfills, and vary from site to site due to state requirements and site designs. During Nicolai's time with Casella, there were 70 to 75

1

transactions with Solmax relating to the purchase of biosynthetics.   During the course of his employment at Casella, Nicolai met with representatives from Solmax at Casella's Rutland and Clifton Park offices, but not on an annual basis.

Casella typically issues Requests for Proposals ("RFPs") at the end of the year for construction projects planned for the upcoming year.  Nicolai was typically the lead for Casella in managing procurement, including reviewing the documents, RFPs, and results; he participated in conversations deciding which companies Casella would award contracts.  This yearly process has been similar for his time employed by the company.

Typically, Casella's budget was finalized in October or November timeframe, and informed what projects would be built in the upcoming year.  As part of this process, in November, Casella determined the quantity and materials required for the upcoming projects. Casella then incorporated that information into the RFP document.  Conformance testing was critical to Casella, in order to understand whether the material meets the standards needed by a particular facility.  Samples of the manufactured material are sent to a laboratory that performs tests to ensure compliance with Casella's standards and necessary performance specifications.  The only place in the transaction with a materials vendor in which the conformance testing and specifications are found is the RFP.

It was typical to award multiple sites to a particular vendor.  Nicolai reviewed the compiled summaries of the information and participated in the decision-making process to award the bids. Casella then sent out the award letters, notifying the vendors that Casella was awarding them the contract.  After the notice of award, Casella's individual locations would issue purchase orders that matched the information in the award letter, so that the financial details lined up for each location's budget.  Nicolai signed off on each purchase order.

In December 2023, Casella sent an RFP to Michael Winterbourne at Solmax. See Hearing Exhibit 1 at 1 ("Exh. 1").  The RFP was for projects at 6 facilities in 4 different states, for

2

geosynthetic membrane liner and clay liner. The RFP contained several attachments. Attachment 2 includes the bid forms, which require the bidder to fill in the quantity and pricing. Attachment 3 includes general material requirements. Attachments 4–7 include specifications for materials at the individual sites. Attachment 8 "provides the terms and conditions of the standard Casella Coupa Purchase Order that will govern the invoicing and payment process for the selected vendors(s)." Exh. 1 at 2. The RFP states that "[f]or Bid submittal, only pricing, material cut sheets and a certification of compliance with the respective material specifications is required," although it permits bidders to provide "supplemental information." *Id.* Specifically, the RFP requires that "[a] responsive Bid will consist of the Bidder's material cost as provided on the submitted Bid Form (Attachment 2), cut sheets for each proposed material, and a certification of compliance that the properties of the Bidder's proposed material(s) meet or exceed the detailed technical specifications (as presented in Attachments 4 - 7)." *Id.* The RFP describes that selected vendors will receive a Notice of Award along with a request to submit technical support information, and that following the receipt of that information, Casella will issue a site-specific Purchase Order. *Id.* at 2. Finally, before any actual deliveries, the vendor must submit acceptable conformance testing data. *Id.*

> The RFP contains miscellaneous, specific requirements:
>> Vendors shall supply one (1) bag of zip ties (minimum 1,000 ties per bag) for every 20,000 square feet of geocomposite delivered to a given landfill site. Each geocomposite roll delivered shall be equipped with appropriate lifting straps (*2 per roll*) for safe/secure unloading. The cost for these zip ties and lifting straps shall be included in the per square foot unit price for delivered geocomposites.
>> Vendors shall supply one (1) spool of 5mm welding rod spools (minimum 15-pound spool) for every roll of geomembrane delivered to a given landfill site. Each geomembrane roll delivered shall be equipped with appropriate lifting straps (*2 per roll*) for safe/secure unloading. The cost for these spools and straps shall be included in the per square foot unit price for delivered geomembrane.
>> Vendors shall supply one (1) bag of bentonite (minimum 50-pound bag) for each roll of GCL delivered to a given landfill site. Each roll of GCL shall be equipped with appropriate lifting straps (*2 per roll*) for safe/secure unloading. The cost for these bags and straps shall be included in the per square foot unit price for delivered GCL.

Exh. 1 at 3.

Attachment 8 of the RFP includes Casella's terms and conditions. In pertinent part, the terms and conditions provide as follows:

> 1. These terms and conditions of purchase (these "**Terms**") are the only terms which govern the purchase of goods ("**Goods**") and services ("**Services**") by Casella Waste Systems, Inc., its subsidiaries and affiliates ("**Buyer**") from the seller named above ("**Seller**"). Notwithstanding anything herein to the contrary, if a written contract signed by both parties is in existence covering the sale of the Goods and Services covered hereby, these Terms shall prevail in the event of an inconsistency or omission, unless it specifically acknowledged otherwise in the written contract or as provided in Section 28. The purchase order printed above (the "**Purchase Order**"), and these Terms (collectively, this "**Agreement**") comprise the entire agreement between the parties, and supersedes all prior or contemporaneous understandings, agreements, negotiations, representations and warranties, and communications, both written and oral. These Terms prevail over any of Seller's general terms and conditions of sale regardless whether or when Seller has submitted its sales confirmation or such terms. This Agreement expressly limits Seller's acceptance to the terms of this Agreement. Fulfillment of this Purchase Order constitutes acceptance of these Terms.

Exh. 1 at 230.

> 23. Governing Law. All matters arising out of or relating to this Agreement are governed by and construed in accordance with the internal laws of the State of Vermont without giving effect to any choice or conflict of law provision or rule whether of the State of Vermont or any other jurisdiction that would cause the application of the laws of any jurisdiction other than those of the State of Vermont.
> 24. Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted in the federal courts of the United States of America or the courts of the State of Vermont in each case located in State of Vermont and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

Exh. 1 at 235.

On January 15, 2024, Winterbourne sent Casella an email with Solmax's completed bid form attached. Hearing Exh. 2 ("Exh. 2") at 1. He noted that he would also send separate emails per site with the Solmax "quotes" and cut sheets. *Id.* The bid email did not include any terms and conditions.

4

The same day, Winterbourne sent by separate email the Solmax "quote" for the McKean site in Kane, Pennsylvania.  Hearing Exh. 3 ("Exh. 3") at 1.  The attachments included technical data sheets, a "quotation" on Solmax letterhead mirroring the quantities and prices from the bid sheet, exception notes per product, and finally, Solmax's Terms and Conditions.  Those terms and conditions provide, in pertinent part, as follows:

> 1. COMPLETE AGREEMENT: These Seller's Terms and Conditions ("T&C") are attached to and an integral part of the Quotation for the sale/purchase of products to Buyer (the "Product"") for the project referenced therein (the "Quotation") between the Seller (named in the Quotation) and the Buyer (named in the Quotation). Such Quotation shall be binding between the parties upon the Seller's receipt and acceptance of the Buyer's written purchase order, order, acceptance, confirmation or acknowledgment (herein the "PO"), it being understood that any PO submitted by the Buyer shall be deemed to reflect, acknowledge, refer to or accept the terms and conditions contained in the Quotation. The Quotation, these T&C (including all exhibits relating thereto), the Credit Approval (as herein defined), the PO (excluding any terms and conditions different from or additional to those contained in the Quotation, these T&C and the Credit Approval) and the sales order represent the complete agreement between the parties (the "Contract") and no terms or conditions made by the Buyer verbally, in the PO or otherwise in any way adding to, modifying or otherwise changing the provisions stated in the Quotation, the T&C and the Credit Approval shall be binding upon the Seller.
>
> In no way shall the Seller be required to accept a PO by signing the said PO, whether electronically or manually after Buyer has accepted the Quotation and issued its PO. Notwithstanding the foregoing and in the event, Seller signs a PO, Buyer confirms and acknowledges that the signing of the PO, whether electronically or manually, is not intended and does not constitute consent or agreement in any way to vary the Contract, which shall remain in full force and effect and unamended. Seller does not agree, does not accept and herein rejects any of Buyer's terms and conditions appearing in any PO or separate agreement whether signed by both parties or not, whether appearing online or on a webpage, which may vary, alter, conflict with, add to, or otherwise change the Quotation, the T&C and the Credit Approval. The Contract supersedes all prior agreements, understandings, writings, proposals, representations and communications, oral or written, of either party with respect to the

5

subject matter hereof and the transactions contemplated hereby. No amendment of any provision of this Contract shall be valid unless made in writing and signed by both parties specifically referencing the portion of the Contract being amended.

Exh. 3 at 7.

12. GOVERNING LAW AND ARBITRATION: The Contract shall in all respects be governed by and construed according to the laws of the Province of Quebec, Canada, including the Quebec Act respecting the United Nations Convention on Contracts for the International Sale of Goods (CQLR, c. C-67.01), despite any applicable conflict of law provisions.

Notwithstanding the foregoing, this Contract and any dispute involving a Seller that is a legal entity incorporated in the United States of America shall be governed by and construed according to the laws of the State of Texas without regard to its conflict of law provisions.

All disputes, controversies or claims arising out of or relating to the Contract, or the breach thereof, shall be finally settled by arbitration administered either by:

a. the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules;

b. the International Centre for Dispute Resolution Canada ("ICDR Canada') in accordance with its Canadian Arbitration Rules; or,

c. by the /International Centre for Dispute Resolution ("ICDR"') in accordance with its International Arbitration Rules; depending on whether it is an American domestic dispute, a Canadian domestic dispute or an International dispute as decided by the AAA, ICDR Canada or ICDR unless the parties agree otherwise.

In the case of an American domestic dispute, the place of the arbitration administered by the AAA will be in Harris County, State of Texas and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. For greater clarity, the parties hereby consent to personal jurisdiction in said county and further consent not to assert any venue claims based upon *forum non conveniens*.

Exh. 3 at 9.

Winterbourne sent another email on January 15, 2024 including the Solmax quote for the Ontario County site in Stanley, New York. Hearing Exh. 4 ("Exh. 4") at 1. Attachments to that email included a technical data sheet, a quotation again mirroring the quantity and price information from the bid sheet, notes on exceptions by product, and again, the Solmax Terms and Conditions.

6

Casella sent Solmax a Notice of Award on February 9, 2024, listing materials, quantities, and prices for multiple sites, including the McKean and Ontario County Landfills, and noting that it would soon issue site-specific purchase orders. Hearing Exh. 5 ("Exh. 5") at 1. Casella then sent purchase orders for the individual sites. The purchase orders for McKean and Ontario County did not include Casella Terms and Conditions. Hearing Exhs. 6–8. Other purchase orders that Casella issued to Solmax at that time (for a site in Maine) included the Casella terms and conditions.

Solmax then sent Sales Orders confirming the materials, quantities, and prices for the McKean site. See Hearing Exhs. Z, AA, and BB ("Exh. Z," etc.). Those Sales Orders included the Solmax Terms and Conditions. *Id.*

Solmax sent an updated "quotation" on February 16, 2024, correcting a $0.003 pricing error. Like the previous quotations, it included the Solmax terms and conditions. Hearing Exh. V ("Exh. V"). On February 29, 2024, Solmax asked Casella to confirm the pricing and quantity, which Casella confirmed. Exh. 11 at 5.

Kenneth Gelting started working for Casella in 2022 and retired in March 2024. He was the Senior Engineer involved in procuring geosynthetics for Casella sites. Gelting generated the RFP and ran it by Nicolai before sending it out to vendors. He would typically receive 8 to 12 bids. Gelting would review the bids to evaluate whether they were conforming bids, if they met the RFP requirements, if they were signed, and if they were complete. Terms and Conditions were not an item that the RFP requested that bidders submit; accordingly, Gelting did not review the Solmax terms and conditions. He sent the purchase orders to Solmax. Gelting never reviewed Solmax's Terms and Conditions, nor was he aware of any discussion of them at Casella.

When sending the purchase orders to Solmax, Gelting reviewed them for quantities and prices. Gelting was accustomed to seeing Casellas terms and conditions attached to purchase orders as exemplified by Hearing Exhibit 13.

7

Debora McPhee has been the Home Office Controller at Casella for 4 years. She is involved in creating purchase orders that are sent to vendors. Casella uses 2 systems, NetSuite and Coupa, to generate purchase orders. When Casella uses Coupa, every purchase order automatically includes Casella's terms and conditions. Prior to 2021, Casella only used NetSuite to create purchase orders. McPhee can access all purchase orders that Casella has send out. She examined the purchase orders sent to Solmax in both systems. Since Casella began using Coupa, 26 purchase orders to Solmax were created in Coupa, while 10 were created in NetSuite. NetSuite does not automatically add terms and conditions. The purchase orders at issue in this case were generated by NetSuite.

Michael Winterbourne is a sales representative for Solmax, and has worked on orders from Casella for the past 21 years. To his knowledge, Solmax and Casella have never litigated any disputes. He is accustomed to sending a separate quote in addition to bids so that he can list exceptions and include the Solmax terms and conditions. After he received the Casella Notice of Award and purchase orders, he generated sales orders. The sales orders automatically included the Solmax terms and conditions. After confirmation, Solmax was cleared for production, and releases samples for third-party conformance testing. Assuming compliance with Casella's standards and specifications, after the testing, the order is shipped.

## Discussion

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation omitted). The question of whether the parties are bound by an agreement to resolve a particular dispute through arbitration is generally for a court of law to decide, particularly when there is a question of contract formation. *See, e.g.*, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010). The Vermont Arbitration Act authorizes the court to stay arbitration to resolve disputes as to whether there is an enforceable agreement to arbitrate. The Act provides as follows:

8

On application to compel or stay arbitration, and on a showing that there is no agreement to arbitrate, the court may stay a commenced or threatened arbitration proceeding. When in substantial and bona fide dispute, the issue of whether there is an agreement to arbitrate shall be forthwith and summarily tried. The court shall order the stay if it finds no enforceable agreement to arbitrate. Otherwise, the court shall order the parties to proceed to arbitration.

12 V.S.A. § 5674(b).  Casella argues that it is not bound by an agreement to arbitrate its dispute with Solmax, and requests that the Court stay the arbitration proceedings that have commenced in Texas.

The dispute involves "a contract evidencing a transaction involving commerce," and accordingly, the Federal Arbitration Act ("FAA") requires that written agreements to arbitrate be valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

It is undisputed that the parties had an agreement for the purchase and sale of geosynthetic clay liner.  The agreement, however, is not found in a single document, but rather, was formed during a series of communications.  At issue is whether Casella's terms and conditions, or Solmax's terms and conditions, became an enforceable part of the overall agreement.

The parties agree that the question of whether Solmax's terms and conditions apply to the parties' deal, in particular the arbitration provision within its terms and conditions, is to be resolved by application of the Uniform Commercial Code ("UCC").  *See Bourdeau Bros. v. Boissonneault Fam. Farm, Inc.*, 2020 VT 35, ¶ 8, 212 Vt. 231 ("For purposes of the UCC, a merchant is defined in relevant part as 'a person who deals in goods of the kind or otherwise by his or her occupation holds himself or herself out as having knowledge or skill peculiar to the practices or goods involved in the transaction.' ") (citing 9A V.S.A. § 2-104(1)).

UCC § 2-207, Vermont's 9A V.S.A. § 2-207, supplanted the common law rule that an

acceptance of an offer that differs from the original offer by including additional terms or conditions is not treated as an acceptance, but rather, as a counteroffer. *See* 2 Williston on Contracts § 6:17 (4th) ("The common-law rule that if the offeree's response to an offer qualified the offer, such as by adding to it or differing from it, no acceptance took place and a rejection resulted, sometimes referred to as the 'mirror image rule,' had the virtue of maintaining the offeror as the master of the offer and providing for certain resolution of conflict."); 1 White, Summers, & Hillman, Uniform Commercial Code § 2:13 (6th) ("Section 2-207 rejects the common-law mirror-image rule and converts many common-law counteroffers into acceptances under § 2-207(1)."). 9A V.S.A.§ 2-207 provides the following:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>> (a) the offer expressly limits acceptance to the terms of the offer;
>> (b) they materially alter it; or
>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

As one treatise noted, "[a]fter decades of experience with the section, the only thing clear about the section is that it is inherently unclear; this, partly because of its awkward phrasing, partly because of the numerous situations it was designed to address and the many more it has been used to address, and partly because of a judicial reluctance to apply the statute too literally." 2 Williston on Contracts

§ 6:17 (4th) (footnotes omitted).  The crux of the parties' dispute is when an "offer" was made, such that subsequent additional or different terms are treated in accordance with section 2-207(2).

Solmax argues that the only points at which a contract formed all include Solmax's terms and conditions, and thus, its arbitration provision survives analysis under section 2-207.  According to Solmax, the RFP was not an offer, but rather, was an invitation to deal, as it makes clear that Casella would only issue purchase orders after determining with which bid it would proceed. *See Compass Auto. Grp., LLC v. Denso Mfg. Tennessee, Inc.*, No. 12-10919, 2013 WL 655112, at *3 (E.D. Mich. Feb. 22, 2013) (RFQ was "invitation to deal").  Indeed, "[a] sufficiently detailed price quotation can be an offer." *ETC Intrastate Procurement Co., LLC v. JSW Steel (USA), Inc.*, 620 S.W.3d 168, 174 (Tex. App. 2021).  Similarly, "some price quotes are sufficiently detailed to be deemed offers, which turns a subsequent document from a buyer containing a positive response into an acceptance." *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 650 (E.D. Pa. 2002).  Relying on *Compass Auto*, *ETC Intrastate Procurement*, and *Reilly Foam*, Solmax contends that its quotation contained sufficient detail to be considered to be an offer.

The question of whether the quotation can be construed as the offer, and the purchase order as the acceptance, is significant for analysis under section 2-207.  The quotation contained Solmax's terms and conditions, including the arbitration provision.  The purchase orders were silent on the question of choice of forum and arbitration because for these two sites, Casella failed to include its terms and conditions in the purchase order.  If those assumptions are correct, then there is no "additional term" or contradictory "different term" in the acceptance, and the arbitration provision becomes an enforceable part of the agreement. *See U.S. for Use & Benefit of Control Sys., Inc. v. Arundel Corp.*, 814 F.2d 193, 198 (5th Cir.), *decision clarified on denial of reh'g*, 826 F.2d 298, n.7 (5th Cir. 1987).

Solmax's argument misses the point. In the very cases that it cites in support of its position, the court held that "[a]n offer is an act that leads the offeree reasonably to believe that assent will

conclude the deal." *ETC Intrastate Procurement Co., LLC*, 620 S.W.3d at 174; *see also Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d at 651. ("As is the case with a purported offer under the common law, the seller must intend that the contract exist upon acceptance of the offer; that is, it must reasonably appear from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract.") (quotation omitted). Such would be the case if the quotation contained only the required elements of the bid, namely the quantities and prices, and the technical specifications to conform with the RFP's requirements. Instead, Solmax added terms and conditions to the quotation, which underscore that a purchase order does *not* conclude the deal until Solmax accepts the purchase order, so the situation here differs materially from that in *Compass Auto* and *ETC Intrastate Procurement*. The Court cannot agree that under these circumstances the quotation, with the Solmax terms and conditions, constituted an offer, because under its own terms, a Casella purchase order in response would still require further acceptance from Solmax. It was an offer to make an offer. *See* Restatement (2d) of Contracts § 26 (1981) ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."). The Casella purchase order was the offer, which Solmax accepted through its sales order. *See SEC Am., LLC v. Marine Elec. Sys., Inc.*, 2011 VT 125, ¶ 8, 191 Vt. 541 ("[T]he submission of a purchase order is generally considered to be an offer to purchase which the seller may then accept or reject.") (citing *L.V. Appleby, Inc. v. Griffes,* 160 Vt. 601, 602 (1993) (mem.) (holding that "[s]ubmission of the purchase order ... was an offer to purchase")). The Solmax accepted added an additional term requiring arbitration.

Solmax contends that the price correction could also be construed to be an all-new offer, which also included the Solmax terms and conditions. However, this was clearly considered to be a

post-deal correction of a minor error, and Casella's acceptance of the corrected term is not an entirely new agreement.

Solmax argues in the alternative, that if the purchase order was the offer, Solmax's inclusion of its terms and conditions, and thus its arbitration provision, in the sales order resulted in it being included in the agreement as an additional term that does not fall into any of the exceptions in section 2-207(2). Casella responds that the arbitration term is a material alteration under section 2-207(2)(b), and thus does not become part of the contract.

"[M]ost courts agree that an additional term is a material alteration if it would result in unreasonable surprise or hardship if incorporated without the buyer's express awareness." *Bourdeau Bros. v. Boissonneault Fam. Farm, Inc.*, 2020 VT 35, ¶ 11, 212 Vt. 231 (collecting cases). "[T]he test for a material alteration under 9A V.S.A. § 2-207 is whether the additional term would result in surprise or hardship to the nonassenting party." *Id.* Casella's argument is that the incorporation of the arbitration term would result in surprise. "[W]hether an additional term in a written confirmation constitutes a 'material alteration' is a question of fact to be resolved by the circumstances of each particular case." *Id.* (quoting *N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 726 (8th Cir. 1976). "[R]elevant factors to the materiality determination may include the prior course of dealing between the parties, the number of written confirmations provided by plaintiff, and whether the term reflects industry custom." *Bourdeau Bros.*, 2020 VT 35, ¶ 13. "[T]he materiality of an alteration depends largely on the subjective, and objectively reasonable, expectations of the parties in the context of a particular transaction or business relationship." *Id.* (citing *Ebasco Servs. Inc. v. Pa. Power & Light Co.*, 402 F. Supp. 421, 442-43 (E.D. Pa. 1975) (explaining Official Comment 4 "indicates to us that the materiality of a change is to be judged in large part by the expectations of the parties involved in the transaction," which "is a determination uniquely within the province of a fact finder")).

Casella's agents involved in the transaction with Solmax never discussed any arbitration provision, and they disregarded the terms and conditions attached to Solmax's quotation and sales orders. Casella included sophisticated terms and conditions in its RFP, which additionally indicated that those terms and conditions were to be included with purchase orders. The RFP announced Casella's intention to include its terms and conditions with its purchase orders and through the language of those terms, to exclude the enforceability of any additional or different terms introduced by the other party in its dealings. Those terms, included in the RFP, also clearly indicate that Casella intended that the parties it conducted business with would take conflicts to Vermont courts or federal courts in Vermont. Casella implemented a system (Coupa) that automatically added those terms and conditions when it generated purchase orders—and then unintentionally omitted to manually include the terms and conditions when they used a different, and older, system to generate the purchase orders in this case. Once Casella implemented Coupa, it generated 36 purchase orders, of which 26 were generated with Coupa and therefore included the Casella terms and conditions automatically; ten were generated with NetSuite. The omission of the terms and conditions in the purchase orders for McKean was an error. The prior course of dealing of the parties shows that Casella included terms and conditions that effectively prevented Solmax from adding additional or different terms and conditions.

Because Casella's terms were written in such a manner that its purchase orders constituted offers and included its terms and conditions by design, the result reasonably anticipated under section 2-207 is that either the other side's terms, presented in confirmations or sales orders, would not be included, or that the conflicting terms would simply be knocked out. Casella thus amply proved that it was "subjectively" surprised by the arbitration clause.[1] *See Avedon Eng'g, Inc. v. Seatex,*

---

[1] Nicolai testified that he would not be surprised if another party attempted to include their own terms and conditions, but that does not change that it would be surprising if those terms actually became part of the deal. *See* 9A V.S.A. § 2-

112 F. Supp. 2d 1090, 1095 (D. Colo. 2000) (concluding that there was subjective surprise even when party ignored multiple copies of the terms in question).

Although Winterbourne testified that he could not generate quotations or sales orders without the Solmax terms and conditions, he did not testify to having direct knowledge that Casella actually received the terms and conditions with all of the past quotations and sales orders, or that he received specific confirmation at any point from Casella that it had received the Solmax terms and conditions.  Even if Casella received those terms during past transactions, "the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2–207."  *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 104 (3d Cir. 1991).  There was no prior action that would have indicated to Casella that the Solmax terms would have ever been enforceable with regard to any of the parties' prior transactions.  The question is not whether Casella would be surprised that Solmax desired to include its own terms and conditions in the parties' agreement, but rather, whether those terms and conditions, even if Solmax repeatedly attempted to include them, were actually incorporated in the agreement.  As stated in Step-Saver:

> First, the repeated exchange of forms by the parties only tells Step–Saver that TSL *desires* certain terms. Given TSL's failure to obtain Step–Saver's express assent to these terms before it will ship the program, Step–Saver can reasonably believe that, while TSL desires certain terms, it has agreed to do business on other terms—those terms expressly agreed upon by the parties. Thus, even though Step–Saver would not be surprised to learn that TSL desires the terms of the box-top license, Step–Saver might well be surprised to learn that the terms of the box-top license have been incorporated into the parties' agreement.

207 cmt. 4 (terms are material alterations if they would result in "surprise or hardship if incorporated without express awareness by the other party").

*Step-Saver Data Sys., Inc.*, 939 F.2d at 104 (emphasis in original). Casella was not surprised that Solmax wanted to include its own terms but would be surprised if those terms actually became part of the agreement and if they were enforceable.

Unlike in *Avedon* where arbitration provisions in particular were commonly included in the industry in question, it is not as clear in this context, where one party purportedly repeatedly sought to include Vermont courts as a forum for disputes, and the other purportedly repeatedly sought to include an arbitration forum in Texas. The parties have never arbitrated or a litigated a dispute with each other prior to this dispute. Additionally, given the strength of the Casella terms and conditions in knocking out any terms to the contrary, the manner in which Casella limited the requirements for complete bids, and the expectation that purchase orders from Casella, as offers, would include the Casella terms and conditions, it was objectively reasonable for Casella to expect that additional or conflicting terms submitted by sellers would not become enforceable terms of the agreement. A reasonable person handling Casella's side of the transaction would be surprised if any of Solmax's terms and conditions were enforceable and would expect that disputes between the parties—if any ever arose—would be resolved in the forum directed by Casella's terms and conditions, and thus, in a court in Vermont, rather than in an arbitral forum in Texas. Under the circumstances here, where the Casella terms included in the RFP clearly prove that it was Casella's intention that disputes be resolved in a court in Vermont under Vermont law, "it cannot be presumed that a reasonable merchant would have consented to the additional term." *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 708 (2d Cir. 2007).[2] The element of objective surprise is met.

---

[2] Casella's RFP also limits the contents of a completed bid to several simple elements, including price and data. While it indicates that bidders may submit additional information, it is clear from the Casella terms and conditions that Casella wished to exclude additional or different terms from its deals, and that it wanted its own terms and conditions to apply to the deals. Thus, allowing submission of additional information was clearly not an invitation for bidders to include additional or different terms and conditions.

Casella has met its burden to prove objective and subjective surprise in the specific circumstances of the transactions at issue in this case. Thus, under section 2-207(2)(b), the arbitration provision of the Solmax terms and condition is not part of the parties' agreement.[3] Accordingly, the Court finds that there was no enforceable agreement for the parties to arbitrate this dispute. Solmax cannot compel Casella to arbitrate.

Order

For the reasons discussed above, Casella's motion to stay arbitration is granted.

Electronically Signed on: Monday, December 15, 2025 pursuant to V.R.E.F. 9(d).

_____
Susan A. McManus
Superior Court Judge

---

[3] This ruling does not resolve the question of whether any terms and conditions from Casella's RFP became enforceable components of the parties' agreement.